DENISE DONAHUE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Donahue v. Commissioner
Docket Nos. 22943-85, 22946-85, 26000-85, 24966-86
United States Tax Court
T.C. Memo 1991-181; 1991 Tax Ct. Memo LEXIS 208; 61 T.C.M. (CCH) 2460; T.C.M. (RIA) 91181; April 23, 1991, Filed *208 Decision will be entered for the respondent in docket No. 22943-85 and in docket No. 26000-85 as to Anthony and Diane Cutaia and David Koehlinger. An appropriate order will be issued in docket Nos. 22946-85, 26000-85, and 24966-86. Joseph Falcone, for petitioners Donahue and Crane. Hallison Young, for petitioners Cutaia, Koehlinger, and Pasternak. Karen Goheen, for the respondent. DAWSON, Judge. WOLFE, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b) and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: Respondent issued notices of deficiencies to the petitioners in this consolidated case determining deficiencies *209 in, and additions to, their Federal income tax liabilities as follows. Additions to Tax (Sections)
Petitioner(s)
Year
Deficiency
6653(a)
6659
6661
Denise Donahue
1978
$ 3,317.00
$ 165.85
$ 995.10
--  1979
4,478.58
223.93
1,343.40
--  1980
2,751.00
137.55
825.30
--  1981
4,603.00
*230.15
512.10
--  Glenn Crane,
1978
3,103.00
155.15
930.90
--  Deborah Crane
1979
3,371.00
168.55
1,011.30
--  1980
1,055.00
234.40
1,406.40
--  1981
17,306.00
*865.30
2,232.90
--  Anthony J.
1978
7,685.00
384.25
2,305.50
--  Cutaia,
1979
8,576.00
438.80
2,572.80
--  Diana M. Cutaia
1980
952.00
47.60
--
--  1981
15,324.00
*766.20
2,234.40
--  David G.
1979
1,887.00
94.35
566.10
--  Koehlinger
1980
159.99
7.95
--
--  1981
2,921.00
*146.05
--
--  Frank C.
1981
14,970.00
*748.50
1,983.60
--  Pasternak,
1982
8,931.00
*446.55
1,834.20
281.70
Judith Pasternak
*210 Respondent also determined that interest on the deficiencies would be calculated at 120 percent of the statutory rate pursuant to section 6621(c). Petitioners are individuals who invested in various Phonomasters master recording leasing programs. Their cases are representative of approximately 50 docketed cases of petitioners who invested in Phonomasters leasing programs during 1981 and 1982. Some of the parties have agreed to be bound by the outcome of this litigation. The issues for decision are: (1) Whether petitioners are entitled to deductions for lease expenses; (2) whether petitioners are entitled to investment tax credits allegedly passed through to them by the lessors of the master recordings; (3) whether petitioners are liable for the additions to tax under section 6653(a) or section 6653(a)(1) for 1981 and/or 1982 for negligence or intentional disregard of rules and regulations and for 50 percent of the interest due on the deficiency attributable to negligence under section 6653(a)(2) for 1981 and/or 1982; (4) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to a valuation overstatement; (5) whether petitioners *211 Frank and Judith Pasternak are liable for the addition to tax under section 6661 for a substantial understatement of income tax for the taxable year 1982; (6) whether petitioners' transactions in Phonomasters leases were tax-motivated transactions to which interest at 120 percent of the statutory rate would apply, pursuant to section 6621(c). In addition to the master recording issues decided here, some of these test cases involve other issues reserved for later decision. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. At the time the petition was filed, all petitioners except Anthony and Diane Cutaia were Michigan residents. The Cutaias lived in Missouri. For 1981, petitioners invested in one or more of three Phonomasters leasing programs: Pop Phonomasters Leasing, Soul Phonomasters Leasing, and New America Phonomasters Leasing (the 1981 programs). For 1982, petitioners Frank and Judith Pasternak invested in Rock Kandy Phonomasters Leasing. The out-of-pocket costs, section 162 deductions claimed, and section 38 investment tax credits claimed by the petitioners who participated *212 in these leasing programs are as follows: 1981
Petitioner(s)
Program
Cost
Sec. 162
Sec. 38
Donahue
Soul
$ 10,000
$ 10,000
$ 12,253
Crane
New America
9,625
9,625
*19,222
Pop
5,050
5,050
Cutaia
New America
20,125
20,125
24,662
Koehlinger
Soul
5,000
5,000
6,127
Pasternak
Pop
5,500
5,500
8,086
1982
Pasternak
Rock Kandy
6,660
6,660
6,114
Organization of the lessor partnerships and programs
The Phonomasters leasing programs were organized by Joseph Rosanova, Harold Barbret, and Antoine Labbadie, with some involvement of the Detroit law firm of Patmon and Young. Prior to 1981, Joseph Rosanova (Rosanova) had been a producer for Motown Records and Columbia Records. He was a licensed signatory of the American Federation of Musicians with a record label and ability to record, and a composer/publisher with ASCAP. Rosanova was a decision maker at the inception of the Phonomasters programs. He selected the master recordings *213 to be leased to petitioners, helped prepare a marketing plan for the records made from the masters, and recruited Harold Barbret and Antoine Labbadie to find investors for the leasing programs. Harold Barbret (Barbret) was a financial planner and investment advisor doing business in 1981 through companies named Financial Incentives, Inc., and Financial Creations, Inc. Antoine Labbadie (Labbadie) was a Certified Financial Planner and an employee of Financial Incentives, Inc. Barbret and Labbadie promoted the Phonomasters programs through so-called seminars for investors. Rosanova assisted Barbret and Labbadie at their presentations by providing information on the recording industry and on the marketing of records. The first layer in the structure of the Phonomasters leasing programs was a group of four corporations called, respectively, Soul Phonorecords, Ltd., Pop Phonorecords, Ltd., New America Phonorecords, Ltd., and Rock Kandy Phonorecords, Ltd. Each corporation was managing general partner of a limited partnership named, respectively, Soul Phonomasters, Ltd., Pop Phonomasters, Ltd., New America Phonomasters, Ltd., and Rock Kandy Phonomasters, Ltd. Brian Holland, a California *214 record producer and a well-known songwriter, was designated special general partner of the Phonomasters limited partnerships. The business of the limited partnerships was to acquire and then to lease to a group of investors certain master recordings containing enough songs to constitute an album. It was then up to the investors to produce albums and other derivatives of the masters they had leased from the limited partnerships. The partnerships purchased masters for each of the three 1981 programs late in 1981. The performers on these masters were relatively unknown, and the music they performed ranged from new compositions to established standards. Sterling Harrison, the artist for Pop Phonomasters, was a young vocalist with few prior successes. The nine selections on his master recording were all written by co-producers Harold Beatty and Brian Holland, who were well-known and successful Motown musicians. The Soul master recording featured L. V. Johnson, an experienced performer who had achieved some slight commercial success with earlier recordings. Of the eight songs comprising the Soul master, five were original compositions and three were established standards. Monk *215 Higgins, a tenor saxophonist, was the named artist for the New America Phonorecords program, but he was only one of several instrumentalists performing on the album. He was not a well-known performer. The songs on the master were written either by him or by other relatively unknown composers. The limited partnerships for the three 1981 programs entered into virtually identical purchase agreements with the producers or sellers of the master recordings. Each of the agreements provided for the payment of cash to the seller upon execution of the agreement, for an additional cash payment on delivery of the master by December 31, 1981, and for artist royalties. For the Pop master, $ 50,000 was due on signing and another $ 50,000 on delivery. For the Soul master, the amounts were $ 10,000 and $ 27,000 respectively, and for the New America master the amounts were $ 10,000 and $ 40,000 respectively. The basic royalty agreed to for each of the three masters was 10 percent to the artist and 6 percent to the producers on net U.S. sales in excess of $ 50,000. Additional royalties, computed as a percentage of the basic royalty, were specified for foreign sales, sales to record clubs, educational *216 institutions, libraries, tape sales, budget sales, and reissues. The 1981 masters were made available to the limited partnerships by the end of 1981. For the Rock Kandy program, the organizers attempted to acquire a master recording by Bonnie Pointer, a singer who had three Top 100 pop singles and several successful soul music recordings to her credit. No purchase agreement ever was concluded for a Bonnie Pointer master recording. Participation in the leasing programs
The leasing programs were referred to as "Co-tenancies" by the parties to the programs. To enroll in a leasing program, an investor signed a two-page "Offer to Participate in the Co-tenancy and Operating Agreement and Phonomasters Lease" (the Offer). This document expressly stated that no partnership relationship existed among the participating co-tenants. The Offer also stated the undivided fractional leasehold interest that each participant would acquire upon payment of his or her share of the acquisition cost of the leasehold interest. Participants in the Pop, Soul, and New America programs were instructed to make payment to the "Leasing Agents," Labbadie, Barbret, or Financial Creations, Inc., by the *217 end of 1981. Participants in the Rock Kandy program were required to make payment to the same persons by the end of 1982. Petitioner Frank Pasternak (Pasternak) was a certified public accountant whose clients included Harold Barbret's businesses. At the request of Barbret and Labbadie, he agreed to act as "Co-tenancy Operator" (CTO) for the Phonomasters programs. By signing the Offer, each participant appointed Pasternak to be his or her attorney-in-fact and authorized him to execute, on behalf of the participant, the Co-tenancy and Operating Agreement (Operating Agreement), the Phonomasters Lease Agreement, and the Phonomasters Marketing Agency Agreement. The investors also authorized Pasternak to execute on their behalf any documents required under section 48(d) and section 1.48-4(g), Income Tax Regs., to pass through investment tax credits from the lessor to the lessees. The Operating Agreement which Pasternak signed on behalf of the Co-tenancy states the rights and duties of the individual co-tenants in relation to each other and their collective rights and duties in relation to the Co-tenancy operator. Management, direction, and control of the Co-tenancy was vested in *218 the co-tenants to the extent they exercised it. Each co-tenant was expected to "devote as much of his or her personal time and effort to the Co-tenancy as is required for efficient operation of the Co-tenancy." However, subject to the co-tenants' instructions, the CTO was given the exclusive right and duty to conduct Co-tenancy operations. Among the CTO's duties were the maintenance of the Co-tenancies' books and records. The CTO also was authorized to pay all ordinary and necessary expenditures without consulting the co-tenants. The Operating Agreement further required that all funds advanced or borrowed by the co-tenants for the purposes of the leasing program and proceeds from the sale of products of the program were to be deposited to a bank account in the name of the Co-tenancy. The bank account was to be established by the CTO, "subject to withdrawal by such person or persons as the Co-tenancy Operator may from time to time designate." Profits and losses from the venture were to be allocated ratably among participants. The co-tenants agreed to pay in advance the CTO's expenses and overhead. They had the right to remove the CTO at any time by the affirmative vote of co-tenants *219 owning 50 percent of the interest in the Co-tenancy. Pasternak executed, on behalf of each Co-tenancy, the lease agreement between the limited partnership as lessor and the Co-tenancy as lessee. Each lease conveyed to co-tenants the exclusive right to exploit the masters commercially for a term of three years from the date of the lease, with no option to renew or extend the term of the lease or to purchase the master upon expiration of the lease. The lease required the payment of a minimum fixed sum plus a "percentage rental" in each lease year based upon subsequent sale of records and tapes from the master recording. For each of the 1981 programs, the fixed sum of $ 112,500 was due and payable in full by December 31, 1981. For the Rock Kandy lease, the fixed sum of "between $ 325,000.00 and $ 390,000.00" was due by December 31, 1982. For all programs, the "percentage rental" was between 32 percent and 42 percent of gross receipts (net sales computed on the wholesale base price). The rental was intended to be net to the lessor. Interest on late payments was payable at the rate of 7 percent per annum. The agreements also called for compensation to the "leasing agents" of $ *220 30,000 for each of the 1981 programs and between $ 77,400.00 and $ 99,900.00 for the Rock Kandy program. The leases stated that the lessees bore the entire risk and had the duty to indemnify the lessors if the masters were lost, stolen, destroyed, or damaged beyond repair. The stipulated loss value of the masters for each of the three 1981 programs was $ 3,370,000.00 and for the Rock Kandy program, $ 6,144,400.00. The lessees agreed to insure the masters for these amounts. The leases also required the lessees to assume all responsibility for payment of the costs incurred in processing and manufacturing records from the masters, for obtaining permission to use copyrighted material, and for paying royalties to third parties for materials used in the records produced. All records were to be released under a black-and-white label designated by the lessor, in a jacket provided by the lessor, at the lessees' expense. The lease required the Co-tenancy to employ the services of an experienced marketing/sales agent and to pay in advance a non-returnable fee for manufacturing, packaging and marketing expenses. For each of the 1981 leases, the sum of $ 132,500.00 was due by December 31, *221 1981; for the Rock Kandy lease, between $ 110,200.00 and $ 190,000.00 was due by December 31, 1982. The following amounts were required to be paid by each of the Co-tenancies during the tax years for which deductions and credits are claimed: 1981 programs
Rock Kandy *
Leasing agent's fee
$  30,000
$  99,900
Rent of masters
112,500
390,000
Marketing fee
132,500
190,000
Total expenses
$ 275,000
$ 679,900
Two of the petitioners in the present case, Frank Pasternak and Glenn Crane, were agents for the promoters of the programs as well as investors. As discussed above, Frank Pasternak was selected by Barbret and Labbadie to be Co-tenancy Operator for the programs. In 1981 Pasternak had only modest education or experience in tax matters. *222 Petitioner Glenn Crane was a sales manager for a broker-dealer in 1981 and had known Harold Barbret for many years. After discussing the programs with Barbret and Labbadie, he agreed to market them for a fee. His independent investigation into the programs involved calling a San Diego disc jockey, who was the son of a friend, and making inquiries in Detroit as to the market for the music and the reputation of the people involved in the Phonomasters programs. Taxes were a "motivating factor" behind his own investment in the programs. The other petitioners in the present case learned about the programs through Barbret, Labbadie, or Crane. Petitioner Denise Donahue was employed as a medical technologist at the time she invested in the Phonomasters programs. Crane, who was a close friend, contacted her in late 1981 about attending a seminar at Barbret's office for a presentation on the leasing programs. She was aware that an investment in one of the programs involved risk, but she believed that she would at least get her money back. She reported 1981 gross income of $ 26,592.68 exclusive of losses on the Phonomaster activity. Her $ 10,000 investment in Soul Phonomasters took *223 a large portion of her savings. She made no independent inquiries about L. V. Johnson or about the prospects for success of one of his records prior to investing in the Soul Phonomasters program. Anthony Cutaia was introduced to the Phonomasters programs by Labbadie, who was his financial consultant. At that time, he was employed in quality assurance for the Stroh Brewery Company and was earning nearly $ 75,000 per year. He had no experience with the record industry. He had never heard of Monk Higgins before investing in the New America program and was aware that he was making a very risky investment. He was induced to take the risk because of the likely tax advantages of investing. He made no independent inquiries about the likelihood that a Monk Higgins record would be successful prior to investing. In 1981, David Koehlinger was an engineering recruiter with Ford Motor Company, earning $ 23,941 per year. He was not a musician and knew nothing about the recorded music industry. Although he held an M.B.A. degree, he relied entirely upon the oral advice of Labbadie, his financial planner, in deciding to invest $ 5,000 in the Soul Phonomasters program. He made no effort to *224 learn anything about L. V. Johnson or the prospects for success of one of his records, and he never saw the Phonomasters Lease or Operating Agreement. Those petitioners who attended the seminars for the 1981 investment programs were addressed by Labbadie and Rosanova, who discussed the recorded music industry in general. Petitioners were given little information about the particular performers in the Phonomasters programs and the likelihood of their making successful records. They were told of hypothetical cases where the tax benefits of similar programs exceeded the investment. Petitioners also were shown or told about a projection of the tax benefits they could expect to receive from investing in a Phonomasters program. Early in 1982, Frank Pasternak sent all petitioners a statement informing them of their undivided fractional interest in the Phonomasters leaseholds and their aliquot shares of the investment tax credits and deductions resulting from the 1981 lease transactions. The tax credits and deductions petitioners were advised that they could report were identical to their pro rata interests in the tax benefit projection shown to them or discussed with them at the investment *225 seminars. The amount of the section 162 expenses they were advised to report was exactly the amount they had invested in the programs. Petitioners Donahue, Crane, Cutaia, and Koehlinger filed timely 1981 Federal income tax returns on which they claimed deductions and investment tax credits from the Phonomasters programs as instructed by Frank Pasternak. The Cutaias were able to utilize fully all credits and investment tax credits on their 1981 return, but the others were not. Petitioners Donahue, Crane, and Koehlinger filed amended 1978 and/or 1979 and 1980 returns or a Form 1045 Application for Tentative Refund by June 1982, in order to claim the unused portion of the 1981 investment tax credit. Petitioners Pasternak filed their 1981 return in February 1982 and, after receiving extensions, they filed their 1982 return in October 1983. For both years they exhausted deductions and investment tax credits pertaining to the Phonomasters programs in the year of filing. Co-tenancy operations
Once the co-tenants signed their acceptance of the Offer, they left the management of the Co-tenancies to Pasternak, the CTO. Pasternak knew nothing about the recorded music industry. *226 He executed leases, marketing agreements, and production and distribution contracts on behalf of the Co-tenancies as he was instructed by the Phonomasters promoters. He did not negotiate the terms or keep copies of the documents he executed. He received none of the co-tenants' initial investments and kept no records of their interests. The co-tenants' checks, payable to the various "leasing agents," were deposited to the agents' accounts. The agents then deducted their commissions and paid the balance to a trust account at the law firm of Patmon and Young. Pasternak executed releases permitting the leasing agents to take their commissions from the funds received by the Co-tenancy. Otherwise, Pasternak did not know what happened to the investors' funds after they went to the leasing agents. The Operating Agreement specified that the CTO was obligated to keep records of Co-tenancy activities. Pasternak did not do this. He saw no need to determine whether the investors' funds had been applied as agreed or to verify that marketing, production, and distribution activities were going forward. Nevertheless, Pasternak sent the petitioners notices in March 1981, reminding them to *227 remit a fee of $ 100 to reimburse him for "the costs of administering the activities of this venture." All arrangements for the production of derivatives from the Phonomasters master recordings were handled by a management company called AMTASK. This company was controlled by the law firm of Patmon and Young. Raymond Wainwright of AMTASK was assigned responsibility for disbursing funds needed for the production of records from master recordings. All major disbursements had to be approved by Frederick Patmon. When Pasternak sent petitioners with interests in 1981 and 1982 programs notices of their "aliquot share" of the investment tax credit and section 162 deductions resulting from the lease transactions, Pasternak had no knowledge as to whether the investors' funds had been paid over for section 162 expenses rather than for capital expenditures or other nondeductible expenditures. On October 21, 1982, Pasternak filed Form 1065, Partnership Return of Income, for each of the 1981 Co-tenancies. He attached to this form an election pursuant to section 761 to be excluded from the provisions of subchapter K. Also attached was an election to pass through the lessors' investment tax *228 credits (ITC's) to the lessees. The Rock Kandy partnership return for the 1982 calendar year was filed on October 17, 1983, and includes a section 761 election but no ITC pass-through election. The tax information provided by Frank Pasternak and the tax returns filed by the respective petitioners for 1981 and 1982 were based upon the assumption that the partnerships' cost bases for master recordings were as follows: 1981
-
Pop Phonomaster (Sterling Harrison) -
$ 3,370,000
1981
-
Soul Phonomasters (L. V. Johnson) -
3,370,000
1981
-
New America Phonomasters (Monk Aiggins)
3,370,000
1982
-
Rock Kandy Phonomasters (Bonnie Pointer)
6,144,000
The Phonomasters limited partnerships acquired the master recordings for the 1981 programs for between $ 10,000 and $ 50,000 with promises to pay additional amounts as royalties on actual sales, if any. Petitioners failed to establish the amount of any cost for Rock Kandy at the limited partnership level. Total expenses for the 1981 programs for the co-tenancies during 1981 were $ 275,000. Total expenses for the Rock Kandy co-tenancy in 1982 did not exceed $ 679,900. Expert testimony established that: 1. The Pop Phonomasters *229 master recording had a fair market value on December 31, 1981, of $ 20,000 and a useful life of less than 5 years. 2. The Soul Phonomasters master recording had a fair market value on December 31, 1981, of $ 1,500 and a useful life of less than 3 years. 3. The New America master recording had a fair market value on December 31, 1981, of $ 1,500 and a useful life of less than 3 years. 4. Although no Rock Kandy master recording was in existence on December 31, 1982, a single recording by Bonnie Pointer, allegedly prepared for inclusion in a Rock Kandy master recording, had a fair market value in 1982 of $ 20,000 to $ 50,000. Pasternak made minimal efforts to keep petitioners informed about the activities of the Co-tenancies. The notice he sent each petitioner about tax benefits contained a statement that work was in progress and that the album would be released prior to December 1, 1982. He sent each of them a letter in October 1982, explaining that the marketing agent had decided to release a promotional single record as part of the marketing strategy. At about the same time, he invited them to a co-tenants' meeting on October 27, 1982, purportedly to inform them about the *230 status of the marketing effort. Mavis Staples, a gospel singer, and Bonnie Pointer were present at the meeting. The object of this meeting was to promote future Phonomasters programs; the 1981 programs were not discussed. Petitioners were told about a marketing plan for the 1981 programs at a meeting in February 1983, where Alvertis Isbell, known professionally as Al Bell, was introduced to them. Al Bell had developed a number of small labels of his own and had produced for several other small labels and for Decca records as well. At the time of trial, he was President of Motown Records Group, one of the largest independent record companies in the United States. In the years immediately prior to the transactions at issue here, however, Al Bell was attempting to recover from the bankruptcy of one of his companies and was living with his wife and children in the basement of his parents' home in Arkansas. Among other new ventures, he formed a company called Opportunity Marketing. This company prepared documents which purported to be a marketing plan for the Phonomasters programs. The marketing plan was abandoned for lack of capital. Furthermore, Al Bell was not paid $ 132,000 *231 by each co-tenancy by December 31, 1981, as specified in the lease agreement. It was his understanding that his compensation for marketing was to come from proceeds from the sale of records and he never received any payment from such sales. Sometime in 1983, albums made from the master recordings for the 1981 programs were released. No co-tenant ever received any money from sales of the albums. There is no evidence that any album made from a Rock Kandy master recording ever was released. The record as a whole leads to the ultimate fact conclusions that: The Pop, Soul, and New America Phonomasters transactions are lacking in economic substance consonant with their intended tax effects. The Rock Kandy Phonomasters transactions are a sham. OPINION In the notices of deficiencies respondent disallowed all deductions and credits related to petitioners' Phonomasters transactions. Respondent's determinations are presumed correct and petitioners bear the burden of proving them wrong. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners Cutaia, Koehlinger, and Pasternak argue that the statutory notices were arbitrary and capricious, based upon illegal *232 conduct by respondent, and inadequate to apprise them of the grounds for the adjustments to their tax. They contend that consequently the presumption of correctness was lost and the burden of going forward with the evidence shifted to respondent. No particular form is required for a valid notice of deficiency, and respondent need not explain how the deficiencies were determined. Campbell v. Commissioner, 90 T.C. 110, 115 (1988). All that is required is that the notice advise petitioners that respondent has in fact determined a deficiency and specify the year and amount of the deficiency. Foster v. Commissioner, 80 T.C. 34, 229-230 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985). As for the contention of these petitioners that respondent's conduct was illegal, this Court ordinarily will not look behind the statutory notice of deficiency to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974); Suarez v. Commissioner, 58 T.C. 792, 813 (1972). *233 A trial before this Court is a proceeding de novo to determine a taxpayer's correct tax liability. Our determination is based on the merits of the case and not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner, supra at 327-328. In this case disallowed deductions and investment tax credits are at issue. To establish entitlement to deductions or credits, taxpayers must present positive evidence that they meet statutory requisites. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 78 L. Ed. 1348, 54 S. Ct. 788 (1934). The argument of petitioners Cutaia, Koehlinger and Pasternak that respondent has the burden of going forward as to the disallowed deductions and credits is without merit. Section 162 allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Similarly, section 212 allows a deduction for expenses paid or incurred during the taxable year for the production of income. The claimed leasing agents' fees, rentals of the master recordings, and marketing fees must come within these statutory provisions to be deductible. Section 38 *234 allows a credit for investment in certain depreciable property. The amount of the credit is limited to a percentage of a taxpayer's qualified investment in section 38 property. Sec. 46(a)(2)(A) (redesignated as sec. 46(a)(1) by sec. 474(o)(1), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 834). Qualified investment in new property is a percentage of basis, and basis is generally cost. Secs. 46(c), 1012. The lessor of the property, in this case the Phonomasters limited partnerships, may elect to pass through the credit to the lessees, here the Phonomasters Co-tenancies, and the lessee generally is treated as having acquired the property for its fair market value. Sec. 48(d). The claimed investment tax credits must fit within these provisions. A common threshold for the tax benefits claimed here is that the taxpayer must be engaged in a trade or business or in a transaction entered into with the objective of making an economic profit. Otherwise, none of the claimed credits are allowed, and deductions may be allowed only to the extent that there is income from the activity. Sec. 183. Respondent contends that the expenses and credits were not incurred in connection *235 with a trade or business or an activity engaged in for profit within the meaning of sections 162, 212, or 183 because the Phonomasters transactions were devoid of economic substance. Alternatively, respondent contends that the expenses were not paid or incurred during the taxable year for which they were claimed and that petitioners' bases in the section 38 assets are substantially lower than the amounts claimed. Petitioners dispute all of respondent's contentions. In addition, petitioners Denise Donahue and Glenn and Deborah Crane make the following alternative contentions in their petitions: 1. If the claimed expenditures did not constitute deductible ordinary and necessary business expenses, they are syndication costs or pre-opening expenses which should be capitalized, and a deduction should be allowed; 2. If the expenses deducted by petitioners were for an intangible asset which became worthless or was abandoned in 1981, they should have a deduction for the loss/abandonment; 3. If the transactions did not occur, petitioners suffered a loss and should be allowed a deduction under section 165.
Petitioners Cutaia, Koehlinger, and Pasternak also contend as a *236 preliminary matter that respondent was required to determine profit objective at the Co-tenancy level but failed to do so. See Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 782-784 (1981); sec. 1.702-1(b), Income Tax Regs. The term "partnership" is defined by sections 761(a) and 7701(a)(2) to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate." The Phonomasters co-tenancies are partnerships within the plain meaning of this definition. Petitioners Cutaia, Koehlinger, and Pasternak claim that a determination of partnership profit objective must be made in proceedings governed by sections 6221 through 6233. These provisions, which were enacted by section 402(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, are applicable to partnership taxable years beginning after September 3, 1982, and also are applicable to partnership *237 years ending after September 3, 1982, if the partnership, each partner, and each indirect partner requests such application and the Secretary or his delegate consents to such application. The record is devoid of evidence that the partnerships for either the 1981 programs or the Rock Kandy program are so-called TEFRA partnerships. Petitioners' position is without merit. In determining whether an activity was engaged in for profit, all relevant facts and circumstances are to be taken into account. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). A determination of profit objective can be made with reference to the actions of those individuals who manage the affairs of the partnership. Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner, 734 F.2d 6 (3d Cir. 1984), *238 affd. without published opinion sub nom. Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, 734 F.2d 6 (3d Cir. 1984). Moreover, despite the possible inconsistencies in the positions of various petitioners as to whether profit objective should be determined at the partnership or individual partner level, we need not resolve the question definitively here. The objective for any investment in any of the Phonomasters programs here in issue is so obvious that it must be the same for all of the individual partners or their partnerships. In Beck v. Commissioner, 85 T.C. 557, 569-570 (1985), we summarized the "profit objective" requirement of sections 162, 212, and 183 as follows: Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); *239 Dean v. Commissioner, 83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context means economic profit, independent of tax savings. Herrick v. Commissioner, [85 T.C. 237, 254 (1985)]; Surloff v. Commissioner, 81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.]
The regulations under section 183 list nine nonexclusive factors which may *240 be used in evaluating profit objective. Sec. 1.183-2, Income Tax Regs. However, partnerships are mere formal entities that do not have independent minds of their own, so they present a special problem in applying section 183. Fox v. Commissioner, supra at 1007. Numerous partnership cases have focused on the question of whether a transaction had economic substance. As this Court stated in James v. Commissioner, 87 T.C. 905, 918 (1986): A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious ( Falsetti v. Commissioner, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects ( Frank Lyon Co. v. United States, 435 U.S. 561, 573, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled by business or regulatory realities, is imbued with tax-independent considerations, and is not *241 shaped solely by tax avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. at 583-584 [citations omitted].
Cases focusing on the economic substance of transactions generally have examined the following factors in addition to those enumerated in the section 183 regulations: (1) The presence or absence of arm's-length price negotiations; (2) the relationship between sales price and fair market value; (3) the structure of the financing; (4) whether there was a shifting of the benefits and burdens of ownership; and (5) the degree of adherence to contractual terms. See Rose v. Commissioner, 88 T.C. 386, 410-411 (1987) and cases cited therein, affd. 868 F.2d 851 (6th Cir. 1989). In Rose v. Commissioner, supra, this Court attempted to formulate a unified approach to evaluating economic profit objective in tax shelter cases. In doing so the Court identified the characteristics of a "generic tax shelter." Here, respondent contends that the Phonomasters activities were generic tax shelters and that their economic substance should be analyzed according to the Rose unified *242 approach. Petitioners disagree. We note that appeal from our decision in all but one of the cases in issue, and also apparently in the bulk of cases bound by the outcome of these cases, would lie with the Court of Appeals for the Sixth Circuit, the court which reviewed Rose. This Court will follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals alone. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). Although the Sixth Circuit affirmed our holding in Rose, it declined to adopt the generic tax shelter analysis. Rose v. Commissioner, 868 F.2d at 853-854. Accordingly, like the Sixth Circuit, we focus on the economic substance of these transactions, applying the objective and subjective factors referred to above to determine whether the transactions had any practicable economic effect other than the creation of tax losses. We conclude that they do not, and consequently that petitioners may not claim deductions under sections 162 or 212 or credits under section 38. Our finding that the 1982 Rock Kandy *243 Phonomasters transactions lacked economic substance is based on the absence of convincing evidence that a master recording of Bonnie Pointer songs in which the Rock Kandy limited partnership had an interest actually existed on December 31, 1982. Petitioners repeatedly were asked to produce the master, but were able to offer tapes of only five songs, and of these, only three were finished recordings. Petitioner Pasternak contends that the reason the finished master recording could not be produced for evaluation was that it had been turned over to respondent's agents in 1984 and never returned. In support of this contention, petitioners introduced a letter dated September 26, 1984, from an accountant to IRS Agent James Colwell stating simply that he enclosed "various documents and tapes" on Bonnie Pointer. The documents and tapes are not specified and petitioners have failed to show that the tapes comprised the finished master allegedly leased by the Rock Kandy Co-tenancy. Furthermore, we do not believe that the Co-tenancy would have relinquished complete control of its only copy of the Bonnie Pointer master recording, which allegedly was worth $ 6,144,000. We also take into consideration *244 petitioners' failure to introduce evidence that the Co-tenancy had insured the master, even though by the terms of the Operating Agreement, the Co-tenancy bore the risk of loss. Finally, correspondence between Bonnie Pointer and Rock Kandy Phonomasters dated February 11, 1983, indicates that as of that date the master recording had not been produced and Rock Kandy Phonomasters owned no rights to exploit any of the Bonnie Pointer material scheduled for inclusion in the Rock Kandy master. Petitioner Pasternak's attempt to explain why the master recording could not be turned over to respondent's appraisers does not convince us that the master existed on December 31, 1982. Without the master recording, the Rock Kandy Offer, Operating Agreement, Lease, Marketing Agreement, petitioners' appraisals, and the numerous other documents submitted in evidence in this case are all "a mere paper chase." James v. Commissioner, supra. Accordingly, all claimed expenses and tax credits arising from the 1982 Rock Kandy Phonomasters transactions are disallowed. Our finding that the 1981 Phonomasters transactions lacked economic substance is based in large part on evidence *245 of the manner in which the Co-tenancies carried on the Phonomasters activities. Although the Operating Agreement and the Lease devote numerous pages to a statement of the Co-tenancy Operator's duties, it is evident that these documents are mere window-dressing for transactions structured for tax avoidance. Frank Pasternak did virtually nothing as CTO except file tax returns and inform petitioners of the deductions and credits they should claim. He did not enter into any arm's-length negotiation of the terms of the operating agreement, lease, or marketing agreement. He stated at trial that "the terms were the terms." It is evident that these terms were not to be enforced. Pasternak testified that he did not keep copies of the supposedly important documents he had signed. He also did not keep books and records as specified in the Operating Agreement. He did not purchase insurance to protect the co-tenants from their liability for any loss to master recordings purportedly worth over $ 3 million each. And he did not inquire into the application of Co-tenancy funds. Furthermore, he did not supervise in any manner the agents hired to carry out the production and marketing of products *246 from the master recordings, beyond making a few casual inquiries as to whether any records had been produced. In passive operations such as the Phonomasters Co-tenancies, the care exercised in overseeing the performance of duties assigned to third parties is of particular importance. Flowers v. Commissioner, 80 T.C. 914, 932; sec. 1.183-2(b)(2), Income Tax Regs. Pasternak's inattentiveness to the terms of agreements entered into by the Co-tenancies is consistent with the tax-motivated nature of the Phonomasters transactions. The manner in which the master recordings were purchased by the lessor limited partnerships and the vast discrepancy between the purchase price and the supposed fair market value on which the investment tax credit pass-throughs were based also shows the true nature of these transactions. See Flowers v. Commissioner, supra.
During the last week of December 1981, the various Phonomasters limited partnerships acquired the master recordings for the 1981 programs for between $ 10,000 and $ 50,000 each, with promises to pay additional amounts not exceeding $ 50,000 upon delivery of the masters by December 31, 1981. *247 There is no evidence that the December 31 payments ever were made, and Edward Holland testified that he had received only $ 50,000 from his sale of the Pop master recording of Sterling Harrison's material. The limited partnerships had no obligation to pay anything further except royalties on actual sales of derivatives from the masters, if any. Despite the relatively modest cost of acquiring the master recordings, petitioners claim that the masters each had a fair market value of $ 3,370,000 on December 31, 1981. They submitted in evidence a variety of documents which they claimed were appraisals of these supposed multi-million dollar assets, and they called as witnesses the authors of the purported appraisals. None of the appraisals complied with the requirements for expert witness reports of Rule 143(f), and petitioners' counsel did not move to qualify any of their witnesses as experts. Petitioners' first valuation witness was Clarence Tucker, a former management consultant and leisure-time industry specialist for Price, Waterhouse. Clarence Tucker stated that he had prepared a financial feasibility report for the promoters of the Phonomasters programs. Clarence Tucker's appraisals *248 of the three master recordings are virtually identical except for the description of the songs performed. None of them includes any pro forma projections or income forecasts, and none states the fair market value of the master recording. They merely state that the present value of all future income was greater than the present value of the "investment and associated costs" of the masters. Clarence Tucker testified that he obtained figures on "investment and associated costs" from the Phonomasters promoters, who had given him certain "purchase price documents." His testimony on this matter is generally vague and evasive. The documents he refers to appear to be bills of sale signed by the sellers of the Pop and Soul master recordings. They state that the sellers transferred their entire right, title and interest to the masters "in consideration of the sum of Three Million Three Hundred Seventy Thousand 00/100 Dollars, lawful money of the United States, to be paid by [name of limited partnership] pursuant to the terms and conditions of the Phonomasters Purchase Agreement between the parties hereto." These so-called bills of sale are not signed by the buyers. No more than $ 50,000 *249 of the alleged consideration was paid for any of the masters, and no promissory notes were executed by the partnerships in connection with these purchases. No bill of sale was offered as evidence of the purchase of the New America master. These documents do not provide a satisfactory explanation of why the stated fair market value of the master recordings in the hands of the Co-tenancies is so greatly in excess of the purchase price paid by the lessors. Clarence Tucker also testified that his opinions were based upon "extensive worksheets" projecting numbers of sales and profit margins. He was unable to produce these worksheets at trial even though a continuance was granted to allow him to search his records for such worksheets. At trial, Clarence Tucker also testified that he had not listened to the masters from a "value" point of view. His testimony as to the fair market value of the master recordings is worthless. Petitioners' second valuation witness was Edward Holland, a member of the successful song writing team of Holland, Dosier, and Holland and a well-known figure in the recorded music industry. Edward Holland's appraisals, like Clarence Tucker's, did not state the *250 fair market value of the master recordings. At trial, testifying about the New America master, he stated first that he anticipated sales over a 9-year period of over one million units, then that eight or nine million could be sold over a 20-year period. His testimony was not supported by evidence of comparable sales in the recorded music industry or by any similar evidence that would enable the Court to evaluate his figures. His testimony was unconvincing. Edward Holland also testified that he had received only $ 50,000 in cash for the Pop master recording he had produced, and that he anticipated receiving the balance due to him from sales of the product. In prior cases, we have found that an obligation represented by a nonrecourse note payable solely out of the proceeds of sales was too contingent to be included in basis. See Estate of Baron v. Commissioner, 83 T.C. 542, 549-550 (1984) and cases cited therein, affd. 798 F.2d 65 (2d Cir. 1986). In these cases there is not even a nonrecourse note to support the fair market values and basis claimed by petitioners. Petitioners' third witness on the valuation issue was Brian Holland, the co-producer *251 of the Pop master recording and the special general partner of the Phonomasters limited partnerships. Brian Holland did not prepare an appraisal of the master recordings, and his testimony as to the value of the masters was unsupported by evidence of comparable sales or by anything else that would enable the Court to evaluate the testimony. When respondent's counsel asked him whether, assuming he had the money, he would spend $ 3,000,000 today to acquire one of the three master recordings, he replied that he would purchase the master if he could be assured a "great return." He clarified that he meant he would make such a purchase only if he could pay the purchase price from proceeds he received from sales of the records. We note also that the traditional measure of fair market value of underlying assets does not by itself establish the economic viability of a venture involving leased assets. However, a projected cash flow analysis provides a means of determining whether the transaction realistically had any possibility for economic profit. See Soriano v. Commissioner, 90 T.C. 44 (1988). Such projections are, in effect, a determination of the fair market value *252 of the leased interest. Respondent's valuation witness was Thomas L. Bonetti (Bonetti). Bonetti had been employed in the recorded music industry for 30 years and owned two corporations, Celebrity Licensing, Inc., and Janus Records, Inc., that dealt in the licensing, leasing, sale and purchase of master recordings. At the time of trial Bonetti had prepared approximately 600 formal written appraisals to determine the potential stream of income from master recordings purchased, sold, leased, or licensed by his clients. Of these, between 30 and 60 dealt with masters which, like the master recordings at issue here, fit into the jazz or so-called black music segment of the market. Bonetti noted that most masters of new, previously unreleased artists were appraised at less than $ 100,000. He also stated that in the recorded music industry, over 90 percent of recordings do not recover their cost. Bonetti saw considerable potential in Sterling Harrison's performances on the Pop master recording, but he thought the production quality was below the producers' usual standard. He estimated that with reasonably good airplay, the album produced from the master might sell as many as 20,000 *253 units. Using a potential-stream-of-income valuation method and a useful life of less than five years, respondent's expert set the fair market value of the Pop master recording at $ 20,000 before discounting it to present value. For the Soul master recording, Bonetti found L. V. Johnson's performance, the material, and the production quality to be unexceptional. He estimated sales of fewer than 3,000 units over a useful life of less than three years. He set the value of the Soul master recording as of December 31, 1981, at $ 1,500 before discounting it to present value. In the case of the New America master recording, Bonetti found the material pleasant but unexceptional and the production quality "marginal to weak." He thought it unlikely that the album would get significant airplay and estimated sales of fewer than 3,000 units over a useful life of less than three years. He set the value of the New America master recording as of December 31, 1981, at $ 1,500 before discounting it to present value. Bonetti's credentials as an expert witness are excellent. The substance of his testimony is credible and his manner in testifying was convincing. Accordingly we accept his valuation *254 of the three 1981 master recordings. The record as a whole plainly shows that the Phonomasters transactions here in question were designed as tax deduction schemes in the guise of phonograph record promotion arrangements. The lessor partnerships for 1981 acquired the master recordings for purchase prices of $ 10,000 to $ 50,000 plus promises of additional payments in the nature of royalties to be paid out of receipts from exploitation of the master recordings. There is no evidence that any such additional payments were made. Petitioners failed to establish any amount as paid for the Rock Kandy master in 1982 and also failed to prove that there even was a Rock Kandy master or an agreement for its sale. The amounts actually paid for the 1981 masters were vastly in excess of the value of the masters as established by expert testimony. Even petitioners' witness as to valuation was unwilling to say he would pay for a 1981 master as much as petitioners' asserted value unless he were to pay such amount only out of profits from sales, if any. Nevertheless, petitioners claimed investment tax credits based on the immensely inflated supposed basis of $ 3,370,000 for each of the 1981 masters--even *255 though actual cost was only $ 10,000 to $ 50,000 and no royalties ever were paid. In addition petitioners claimed expense deductions for the full amounts of co-tenancy expenditures, without a showing of the deductibility of such payments. The tax benefits claimed immediately were half again as much as the so-called investment and no revenue ever was produced. The co-tenancy operator, a CPA who was charged with management, kept no records, performed no effective management services, provided tax information which can only be described as plain nonsense, and generally simply did as the promoters told him. Contracts were unrealistic and were not carried out. Promotion and sales plans were not carried out or funded as the funds were wasted or diverted to or by the promoters. The activities were not planned realistically or carried on in a manner which could have resulted in profit. The 1981 Phonomasters transactions were devoid of economic substance consonant with their intended tax effects. Frank Lyon Co. v. United States, 435 U.S. 561, 573, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). Respondent's disallowance of investment tax credits and *256 deductions for the 1981 programs is sustained. Because we have found that the Phonomasters transactions lacked economic substance, it is unnecessary for us to reach respondent's alternative contention that the expenses petitioners deducted were not paid or incurred in 1981. Nevertheless, we note that we are totally unconvinced by the record that many of these expenditures actually occurred in the year claimed. The 1981 phonomasters programs were marketed in December 1981. At that point, masters existed, but no derivatives were in production and no marketing had begun. Petitioners have not convinced us that all moneys invested in the Phonomasters programs in December 1981, were expended prior to January 1, 1982. When Frank Pasternak was asked how he knew petitioners' funds had been spent on section 162 expenses before the end of 1981, he merely stated that it was his understanding that "once the leasing agent had taken the [investors'] money and turned it over to whomever they had turned it over, then the money had been expended." As already noted, he kept no books or records on these expenditures himself. Raymond Wainwright, the AMTASK employee who handled petitioners' funds, *257 testified that he had maintained books and records for each of the Co-tenancies but not according to standard accounting methods. Although he testified that the records were adequate to determine how much money was received and disbursed for each Co-tenancy, petitioners did not produce or introduce into evidence any such records. The fact that a phonograph record actually was produced from masters for the 1981 programs does not convince us that the claimed expenses were incurred in 1981. Furthermore, Al Bell testified that he never was paid the sums specified as marketing expenses by each program and that the marketing of the records was abandoned for lack of funds. Petitioners have not met their burden of proving that the amounts claimed as section 162 or 212 deductions actually were expended in the year for which they were claimed. The alternative contentions of petitioners Donahue and Crane also are without merit. As with the deduction of ordinary and necessary expenses, the amortization of start-up expenditures requires a showing that the expenses were incurred in an activity engaged in with the objective of making an economic profit. Sec. 195(c). Petitioners have failed *258 to make this showing. Section 709(b)(1) permits partnerships to amortize certain organization, but not syndication, fees which are incident to the creation of the partnership, chargeable to capital account, and of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Sec. 709(b)(2). The fees paid to the Phonomasters leasing agents are comparable to brokerage fees and are syndication expenses which must be capitalized. Sec. 1.709-2(b), Income Tax Regs. Rentals and marketing fees are not expenses chargeable to capital account. Petitioners may not amortize any of the disallowed expenses. To be entitled to an abandonment loss, a taxpayer must show "'an intention to abandon the property, coupled with an act of abandonment.'" Ferrell v. Commissioner, 90 T.C. 1154, 1200 (1988), citing Massey Ferguson, Inc. v. Commissioner, 59 T.C. 220, 225 (1972). There is no showing that the 1981 Co-tenancies released any of their rights to the leases or abandoned them in 1981. Section 165(a) permits taxpayers to claim a deduction "for any loss sustained during the taxable *259 year and not compensated for by insurance or otherwise." For individuals, under section 165(c) losses on transactions similar to the Phonomasters programs are limited to those incurred in a trade or business or entered into for profit. As already noted, petitioners' transactions were without economic substance and thus fail to qualify as deductible losses under section 165. The alternative arguments of petitioners Donahue and Crane are all without merit. Additions to tax
Section 6653(a) or 6653(a)(1) and 6653(a)(2): In his statutory notices, respondent determined additions to tax under section 6653(a) or 6653(a)(1) and (2) for negligence or intentional disregard of rules and regulations. Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). These cases are replete with evidence that in claiming the credits and deductions which respondent has challenged, petitioners' conduct was negligent and in some cases rose to the level of intentional *260 disregard of rules and regulations. As a general rule, taxpayers are charged with knowledge of the law. Harrington v. Commissioner, 93 T.C. 297 (1989). While we recognize that some provisions of the Federal income tax are complex, the rule that one may not claim deductions or credits for transactions not entered into with the objective of making an economic profit is well established and is not beyond the comprehension of the layman. Petitioners all claim that they expected to make an economic profit from their investment because they were dealing with individuals who were well established in the recorded music industry. At the same time, they claim that they were aware that the venture they were buying into involved a high level of risk. Their conduct indicates such indifference to this risk that we are convinced that they did not care whether they made an economic profit. None of the petitioners ever had heard of the artists performing on the master recordings, yet they did not listen to the masters prior to investing, seek a reliable independent evaluation of the profit potential of records performed by these artists, or inquire whether the Co-tenancy *261 operator had sought such an evaluation. Cf. Beck v. Commissioner, supra; Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. 782 F.2d 1027 (3d Cir. 1986). None of the petitioners have asserted that they asked for or were given any written projections of volume of sales, costs, and profit margins prior to investing. Petitioners Donahue, Cutaia, and Koehlinger stated that the amounts they invested in the Phonomasters programs were "substantial." Yet by their own admission, petitioners turned their money over to the leasing agents and paid virtually no further attention to their Phonomasters venture. See sec. 1.183-2, Income Tax Regs. Instead, they entrusted the supervision of the Co-tenancies to Pasternak, an accountant with no expertise in the production and distribution of recorded music. Some of the petitioners attended a meeting in October 1982, promoting the Rock Kandy program or a meeting in February 1983, where Al Bell spoke to them about marketing, but otherwise they made only minimal inquiry into whether the programs were going forward. None of the petitioners asked for or were given copies of the Operating *262 Agreement, Lease, or Marketing Agreement for the 1981 programs. None of them bothered to find out about their rights and duties as investors or about any remedies they could seek if their agents failed to perform. Petitioner Crane testified to great dissatisfaction with Pasternak's performance as CTO, but he did not contact other co-tenants or attempt to assert his rights under the Operating Agreement to remove Pasternak from his position. Crane's statements of dissatisfaction are undermined by the fact that he invested funds in the 1982 Rock Kandy venture, in which Pasternak was again CTO. Although petitioners knew that the Phonomasters programs were risky when it came to making an economic profit, they could conclude that even if they lost every cent they invested, they were sure to come out ahead because of tax reductions and refunds. The least affluent of these petitioners claimed a reduction of taxes equal to approximately $ 1.50 for every dollar invested. For those in higher tax brackets, the reduction was close to $ 1.60 for every dollar invested. A reasonably prudent person would have asked a qualified tax adviser if this windfall was not too good to be true. Cf. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), *263 affg. a Memorandum Opinion of this Court; McCrary v. Commissioner, 92 T.C. 827 (1989). Although some petitioners used paid preparers for their 1981 returns and claimed to have relied on them, they offered no evidence that they inquired of the preparers whether the claimed deductions and credits were well grounded in law. At trial, petitioners introduced a document dated February 26, 1983, and entitled "Preliminary Consolidated and Confidential Report of Selected Affairs and Operations" (the Consolidated Report). After five introductory pages stating that the report is a summary of Phonomasters activities through December 31, 1982, the Consolidated Report reads like a prospectus. Exhibit E to the Consolidated Report states in its entirety: PROJECTION OF TAX AND OTHER ECONOMIC BENEFITS 1981 For Each Co-tenancy I.R.C. Sec. 162 Deductions (Ordinary
and Necessary Expenses)
$ 275,000
I.R.C. Sec. 38 Investment Tax Credit
($ 337,000)
Add:  investment tax credit
deduction equivalent benefit
674,000
Total Deduction Benefit
$ 949,000
Ratio of Dollar Write-off
(i.e., $ 275,000 to $ 949,000)
3.45
No assurance can be given *264 that the above estimated deductions or credits will be realized.
Petitioners and their witnesses were all in agreement that they had not seen the Consolidated Report prior to February 1983. We are convinced, however, that if they did not see the above projection, they surely saw or heard something similar to it, prior to investing. Indeed, the statement "No assurance can be given that the above estimated deductions or credits will be realized" would be meaningless in a report issued a full year after petitioners had been advised that they could take identical deductions and credits. We are also convinced that petitioners invested in the Phonomasters programs because they were assured by the promoters that the estimated deductions and credits very likely would be realized. The totality of the evidence convinces us that petitioners knew that they were buying a program that consisted chiefly of window dressing for tax benefits, and that in claiming those benefits on their tax returns without making further inquiry, they either negligently or intentionally disregarded rules and regulations. Respondent's determinations as to the additions to tax under section 6653 are sustained. *265 Section 6659: Respondent also determined additions to tax under section 6659 for an underpayment attributable to a valuation overstatement. A valuation overstatement is a valuation which exceeds the correct valuation by 150 percent or more. Sec. 6659(c). Here, assets with fair market values between $ 1,500 and $ 20,000 were valued by petitioners at $ 3,370,000 each. Petitioners' valuations are by this definition overstated. The additions to tax under section 6659 apply only to petitioners who participated in the 1981 programs. We have found that the Rock Kandy master recording did not exist as of December 31, 1982, and therefore it cannot have been placed in service by that date. See secs. 1.46-3(d)(1)(ii), 1.167(a)-11(e)(1)(i), Income Tax Regs. The underpayment of tax resulting from the calculation of deductions and investment tax credit with respect to an asset that was not placed in service is not attributable to a valuation overstatement. Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). In contrast to the Rock Kandy master, the masters for the 1981 programs were available for use at the end of 1981 *266 and therefore were "placed in service" in 1981 within the meaning of sections 46 and 167 and accompanying regulations. Sears Oil Co. v. Commissioner, 359 F.2d 191, 198 (2d Cir. 1966); SMC Corp. v. United States, 1980 U.S. Dist. LEXIS 13752, 46 A.F.T.R.2d (RIA) 5827, 80-2 U.S. Tax Cas. (CCH) P9642, (E.D. Tenn. 1980), affd. per curiam 675 F.2d 113 (6th Cir. 1982); see also Waddell v. Commissioner, 86 T.C. 848, 897-898 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Furthermore, our findings on the fair market values of the master recordings and petitioners' leasehold interest in them is an integral part of our determination that the Phonomasters transactions lacked economic substance, so the understatement linked to the disallowed credits is attributable to a valuation overstatement within the meaning of section 6659. Cf. Todd v. Commissioner, supra.
Section 6621(c): Respondent determined that petitioners are liable under section 6621(c) for interest at 120 percent of the statutory rate for substantial underpayments attributable to tax-motivated transactions. A substantial underpayment is an underpayment *267 which exceeds $ 1,000. Sec. 6621(c)(2). The additional interest rate applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Further, a tax-motivated transaction includes any sham or fraudulent transaction. Sec. 6621(c)(3)(A). In addition, deficiencies arising from activities not entered into for profit are also tax-motivated transactions. Sec. 6621(c)(3)(B); sec. 301.6621-2T, Q-4 and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). Our findings that assets were overvalued and that the Phonomasters transactions lacked economic substance require us to sustain respondent's determination as to the applicable interest rate for those petitioners whose deficiencies attributable to tax-motivated transactions exceed $ 1,000. Section 6661: Respondent determined an addition to tax under section 6661 *268 for a substantial understatement of income tax on the 1982 return of petitioners Frank and Judity Pasternak. A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). This addition to the tax does not apply to that portion of the understatement to which the addition pursuant to section 6659 is imposed. Sec. 6661(b)(3). The addition applies to returns the due date of which falls after December 31, 1982. Respondent determined a deficiency of $ 8,931 in the 1982 income tax of petitioners Pasternak, of which $ 6,114 pertained to the valuation overstatement and $ 2,817 to other items. The total tax due on the Pasternaks' return, after items disallowed by respondent, is $ 15,884. The deficiency is greater than 10 percent of this amount or $ 5,000, so there is a substantial understatement of income tax for the year. In his computations of the amount of understatement subject to the addition to tax respondent excluded the understatement attributable to the valuation overstatement under section 6659, and the case was tried and briefed accordingly. Since $ 2,817 (the understatement in excess *269 of the portion attributable to valuation understatement) is greater than 10 percent of the amount of the deficiency, petitioners Pasternak are liable for the addition to tax under section 6661 with respect to such amount. Section 6661 as originally enacted in 1982 set the amount of the addition at 10 percent of the amount of any underpayment attributable to the understatement. Section 8002 of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951 amended section 6661(a) to increase the addition to tax for substantial understatements to 25 percent for additions assessed after October 21, 1986. This case has already been tried based on the 10-percent addition, and respondent did not amend the pleadings to seek the 25-percent addition which would otherwise apply. Pallottini v. Commissioner, 90 T.C. 498 (1988). Respondent concedes that only the 10 percent addition should apply. We sustain respondent's determination. To reflect the foregoing, Decision will be entered for the respondent in docket No. 22943-85 and in docket No. 26000-85 as to Anthony and Diane Cutaia and David Koehlinger.
An appropriate order will be issued *270 in docket Nos. 22946-85, 26000-85, and 24966-86. Footnotes
1. The following cases are consolidated herewith: Glenn and Deborah Crane, docket No. 22946-85; Anthony J. and Diane M. Cutaia, docket No. 26000-85; Denise Donahue, docket No. 22943-85; David G. Koehlinger, docket No. 26000-85; Frank C. and Judith Pasternak, docket Nos. 26000-85 and 24966-86.↩
2. All section references are to the Internal Revenue Code, as amended and in effect for the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest due on the deficiency pursuant to section 6653(a)(2).↩
*. Combined ITC claimed for New America and Pop programs↩
*. Maximum expenses specified in lease. Petitioners do not explain the circumstances under which the alternative expenses might be incurred. If the alternative Rock Kandy expenses had been incurred, they would have totaled $ 523,600 ($ 77,400 + 325,000 + 110,200).↩