959 F.2d 234
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Denise DONAHUE, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 91-1849.
 United States Court of Appeals, Sixth Circuit.
 April 7, 1992.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and REAVLEY, Senior Circuit Judge.*
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 Taxpayer Denise Donahue appeals from a Tax Court determination that, as a result of her investment in a tax shelter which lacked economic substance, she was liable not only for tax deficiencies but also for various penalties. Finding no error, we affirm.
 
 I.
 
 2
 The failed venture at issue was a master-recording leasing program. A limited partnership known as Soul Phonomasters, Ltd., acquired master recordings of songs, from which an album was to be made. The price of the masters was $10,000 upon the signing of the sales agreement, $27,000 upon delivery, and artist royalties. The partnership then leased the masters to Soul Phonomasters Leasing (Soul), a co-tenancy. Under the lease, Soul was to pay $112,500 plus a percentage of gross receipts from record sales for the exclusive right to exploit the masters commercially for three years. The lease also required Soul to hire a co-tenancy operator. Frank Pasternak, a CPA, was selected for this position.
 
 
 3
 To participate in the leasing program, an investor would sign a two-page offer to the co-tenancy which stated his or her undivided fractional leasehold interest. By signing the offer, the investor also appointed Pasternak as his or her attorney, authorizing him to execute on the investor's behalf the co-tenancy operating agreement, the lease, the marketing agreement, and all requisite IRS documents enabling the investor to take an investment tax credit ("passed through" from the lessor).
 
 
 4
 Donahue learned about Soul's leasing program from Glenn Crane, one of her close friends. Crane was also a paid agent for the program's promoters. Donahue attended two meetings for investors in 1981. There, she was given general information about the record industry and told of the high-risk nature of the program. The tax consequences of the investment were also explained; the promoters discussed various hypothetical cases in which the tax benefits exceeded the investment. Without asking for or receiving any written sales or cost projections, and without seeking an independent evaluation of the profit potential, Donahue invested $10,000 in the venture. She knew of the risk, but stated that she believed she would at least recoup her investment.
 
 
 5
 After she paid her money, Donahue paid no further attention to the leasing program other than to attend a 1983 investors' meeting. In 1982, Pasternak, the co-tenancy operator, sent Donahue a statement informing her of her share of the tax benefits. The limited partnership had elected to pass through its investment tax credit to Soul, which claimed that the lessor's basis in the master recording was $3,370,000. Based on Pasternak's information, Donahue claimed a $10,000 business expense deduction on her 1981 tax return, as well as an investment tax credit of $12,000. As Donahue's 1981 gross income was $26,000, these tax benefits completely eliminated her tax liability for that year. Donahue also carried back the unused portion of the tax credit to tax years 1978, 1979, and 1980, and she accordingly sought refunds for those years.
 
 
 6
 The IRS disallowed these tax benefits on the grounds that the leasing program lacked economic substance and that Donahue's sole reason for participating was to reduce her taxes. It found Donahue liable not only for tax deficiencies but also for various "additions to tax."
 
 
 7
 In a case consolidated for trial with other Phonomasters investors, the Tax Court sustained the disallowance of Donahue's deduction and investment tax credit as well as the imposition of the penalties.[1] Donahue now appeals.
 
 II.
 
 8
 The Tax Court denied the deduction and investment tax credit after agreeing with the IRS that the leasing transaction lacked economic substance. It based this conclusion on the fact that the price the limited partnership had paid for the master recording vastly exceeded its fair market value, which expert testimony set at $1500 (and there had been no indication that any of the additional payments or artist royalties were ever paid). The court's finding also turned on the manner in which Pasternak managed the operation. He kept no records, carried out no promotion or sales plans, and "provided tax information which can only be described as plain nonsense." According to the court, "[t]he activities were not planned realistically or carried on in a manner which could have resulted in a profit."[2] Donahue does not appeal the denial of the deduction and credits; she challenges only the penalties assessed.
 
 
 9
 Donahue first contends that the Tax Court erred in assessing penalties against her under 26 U.S.C. § 6653(a)(1) and (2).[3] Section 6653(a)(1) imposes a penalty of five percent of a tax underpayment if any part of that underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes an additional penalty of 50 percent of the interest payable on the portion of the underpayment attributable to negligence. The standard meaning of "negligence" applies: "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir.1967), cert. denied, 389 U.S. 1044 (1968). The taxpayer has the burden of proof on the negligence issue. Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir.1989).
 
 
 10
 We review the factual findings of the Tax Court under the clearly erroneous standard. Kennedy v. Commissioner, 876 F.2d 1251, 1254 (6th Cir.1989). A finding that the taxpayer failed to meet the burden of proving due care is a finding of fact. Skeen, 864 F.2d at 96. In this case, the court found that Donahue and the other investors "knew that they were buying a program that consisted chiefly of window dressing for tax benefits, and that in claiming those benefits on their tax returns without making further inquiry, they either negligently or intentionally disregarded rules and regulations." Our review of the record indicates that this finding was not clearly erroneous.
 
 
 11
 The court began its section 6653 analysis by observing that the rule prohibiting deductions and credits for activity not conducted with a profit objective "is well established and is not beyond the comprehension of the layman." Despite the investors' insistence that they expected to make a profit due to the involvement of some prominent members of the music industry, their conduct, according to the court, indicated "indifference" to that prospect. Evidence of such indifference included the fact that none of the investors even claimed to have asked for any written projections on sales, costs, and profit margins before tendering their money; none requested copies of the operating agreement, lease, or marketing plan; none sought an independent evaluation of the profit potential, even though they had never heard of the artists performing on the master recordings; and none bothered to determine what remedies might be available if the promoters failed to perform as promised.[4]
 
 
 12
 The evidence also revealed that the promoters marketed the venture as a tax shelter, informing prospective investors of the tax benefits but providing only minimal information about record production in general. That Donahue invested a substantial amount for her income level, despite her awareness of the venture's risk, suggested a belief that she was "sure to come out ahead because of tax reductions and refunds" even if no profits were ever realized. Indeed, even those investors in the lower brackets claimed tax reductions of $1.50 for every dollar invested. On these facts, it was not fanciful for the Tax Court to find that "[a] reasonably prudent person would have asked a qualified tax advisor if this windfall was not too good to be true."
 
 
 13
 Donahue claims that she did consult professionals: her friend Glenn Crane, and the leasing promoters. Reliance on professional advice may well demonstrate a taxpayer's due care, but such reliance must be reasonable under the circumstances. Skeen, 864 F.2d at 96. There is precedential and logical support for respondent's position that a taxpayer fails to meet the burden of proving due care if she has been found to have entered a sham transaction without a primary profit motivation. Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir.1991). In addition, however, Donahue's so-called advisors had a financial stake in the venture. Crane was a paid marketer of the leasing programs. As for the promoters, their interest is, and was, obvious. "In these circumstances, petitioner[ ] did not rely on competent, independent parties.... Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations." Ryback v. Commissioner, 91 T.C. 524, 565 (1988).
 
 
 14
 Donahue additionally argues that moderate-income investors should not be burdened with the obligation of performing independent investigations of the ventures in which they invest. This argument would have greater appeal if the facts of the case were different, as they were in the case which Donahue cites. In Heasley v. Commissioner, 902 F.2d 380, 383-84 (5th Cir.1990), the Fifth Circuit reasoned, "[i]f we require moderate-income investors to independently investigate their investments, the start-up investigation costs may prevent them from investing at all." The taxpayers in Heasley, however, did not invest in the subsequently-failing venture to avoid tax liability. They invested to earn a profit. Id. at 386. Those taxpayers had also studied the venture's prospectus and its cash flow charts (which showed ever-increasing future profits). Id. at 381. They also "monitored their investment," receiving regular reports, and when they received none of the expected income, "they wrote and telephoned the servicing agent to collect their portion...." Id. at 384. Unsure how to report their investment on their tax return, the Heasley investors had their accountant review the prospectus and the pertinent legal opinions. As the above account of Donahue's activities indicates, she engaged in no such diligence.
 
 
 15
 Accordingly, the Tax Court's finding of negligence is not clearly erroneous.
 
 III.
 
 16
 The Tax Court also sustained the addition to tax under section 6659 for an underpayment attributable to a valuation overstatement--here, an overvaluation of the co-tenancy's asset, the master recording. A valuation overstatement is a valuation exceeding the true value by 150 percent or more. 26 U.S.C. § 6659(c). Donahue does not dispute that the claimed value of the master recording exceeded its fair market value by the requisite amount. Rather, she contends that the underpayment of tax was not attributable to this overstatement, but to the claiming of an improper deduction and tax credit.
 
 
 17
 Donahue again relies on Heasley, a case we find factually distinct from the present one. In Heasley, the Fifth Circuit stated:
 
 
 18
 [w]henever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation. Instead, it is attributable to claiming an improper deduction or credit.
 
 
 19
 Heasley, 902 F.2d at 383. The Heasley court's decision turned on its observation that the petitioners' tax liability, calculated without the improperly claimed deductions, did not "differ one cent" from the liability calculated with the valuation overstatement included. The valuation overstatement thus failed to change the amount of tax actually owed, according to the court. Id.
 
 
 20
 Two factors compel us to reject the Heasley analysis for resolving the present dispute. First, it was unclear from that opinion why the deductions and credits were disallowed; the taxpayers, unlike Donahue, were found to have operated with a profit motive. Second, Heasley relied on that circuit's earlier decision in Todd v. Commissioner, 862 F.2d 540 (5th Cir.1988), a case whose facts differ significantly from those facts we face here. In Todd, the taxpayers claimed depreciation deductions on property found to have an inflated basis. The deductions were denied, however, because the taxpayers had not put the property into service in the tax year for which they claimed the deductions. Id. at 542. The underpayment of tax was correctly attributed to the denial of the (improper) deductions, rather than to the overvaluation of the property. The taxpayers were thus spared the section 6659 penalty.[5] As discussed below, the disallowance of Donahue's deduction and credit was not based on such external reasons.
 
 
 21
 We find the Second Circuit's approach to this issue more pertinent to our own case. In Gilman v. Commissioner, 933 F.2d 143 (2nd Cir.1991), cert. denied, 112 S.Ct. 871 (Jan. 14, 1992), the court was faced with a taxpayer whose depreciation deductions were denied because he lacked a business purpose and the computer equipment sale/leaseback transaction in which he participated lacked economic substance. The taxpayer's basis in the computers was also grossly inflated. The taxpayer had argued, as Donahue does here, "that where the underpayment derives from the disallowance of the transaction (i.e., non-recognition of the transaction for tax purposes), then the underpayment is not attributable to an overvaluation." Id. at 151.
 
 
 22
 There is, of course, some superficial appeal to Gilman's and Donahue's argument.[6] It surely is not irrational to attribute the underpayment to the improper deductions--which, as it so happens, were disallowed because of the transaction's lack of economic substance. The Second Circuit, however, delved deeper into this proffered defense, and focused on why the sale/leaseback was found to lack economic substance. "The lack of substance," according to the court, "was due in part to the [computers'] overvaluation." Id. Thus, the court concluded, " '[w]hen an underpayment stems from disallowed depreciation deductions or investment credit[s] due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under section 6659.' " Id. (quoting Massengill v. Commissioner, 876 F.2d 616, 619-20 (8th Cir.1989)).
 
 
 23
 In Donahue's case, the overvaluation of the master recording was "an integral part" of the Tax Court's determination that the Soul venture lacked economic substance--which lack prevented Donahue from claiming the deductions and credits. We thus sustain the imposition of the overvaluation penalty.
 
 IV.
 
 24
 Donahue also objects to the imposition of increased interest pursuant to 26 U.S.C. § 6621(c). That section authorizes assessment of interest at 120 percent of the statutory rate for substantial tax underpayment "attributable to tax motivated transactions." The term "tax motivated transaction" encompasses "any sham or fraudulent transaction." 26 U.S.C. § 6621(c)(3)(A)(v). As we have upheld the Tax Court's finding that Donahue's motive in the transaction was to reduce her tax liability rather than reap a profit, we also sustain the section 6621(c) penalty. Kennedy v. Commissioner, 876 F.2d 1251, 1256 (6th Cir.1989). Despite Donahue's suggestion to the contrary, the mandatory language of section 6621(c) does not give the Commissioner discretion to waive this penalty.[7]
 
 
 25
 The decision of the Tax Court is AFFIRMED.
 
 
 26
 NO. 91-1894, DONAHUE V. COMMISSIONER OF INTERNAL REVENUE REAVLEY, Circuit Judge, dissenting in part:
 
 
 27
 I concur with parts II and IV but respectfully disagree with part III of the court's opinion and would apply the rule of Heasley v. C.I.R., 902 F.2d 380, 383 (5th Cir.1990), as follows:
 
 
 28
 Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.
 
 
 
 *
 The Honorable Thomas M. Reavley, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The case is reported at 61 T.C.M. (CCH) 2460 (1991)
 
 
 [2]
 The evidence that the promoters wasted or diverted the investors' funds is undisputed. The "sham" is thus twofold: the promoters bilked the investors, who had participated in what they thought was a scheme to reduce their tax liability rather than make money
 
 
 [3]
 The particular version of this section applicable to Donahue's case has since been amended. All statutory references in this opinion are to the Internal Revenue Code of 1954, as amended and in effect during 1981
 
 
 [4]
 Donahue points to a 1986 suit filed against Pasternak by Crane, the marketing agent who told Donahue about the leasing program, and who had also invested his own funds in the venture. Such efforts against the delinquent co-tenancy operator do not undermine the above findings of the Tax Court, however, since they occurred after Donahue received her notice of tax deficiency (in 1985). As the court noted, in 1982 Crane proceeded to invest more money in another Pasternak-operated leasing program, despite his claimed dissatisfaction with Pasternak's management
 
 
 [5]
 The same is true of the taxpayers in the other cases Donahue cites. In McCrary v. Commissioner, 92 T.C. 827 (1989), the tax deficiency resulted from the fact that the taxpayers, as licensees of the master recording rather than lessees, were not entitled to the claimed investment tax credit. In that sense, as in Todd, the underpayment was not "attributable to" an overvaluation of the property. Similarly, in Gainer v. Commissioner, 893 F.2d 225 (9th Cir.1990), the taxpayer had overvalued the limited partnership's shipping container, but his claimed deductions and credits were disallowed because the container had not been put into service in the year at issue. Id. at 228
 
 
 [6]
 As the Second Circuit noted, it is not "self-evident" that the overvaluation penalty applies to transactions found to lack economic substance. Gilman, 933 F.2d at 150. "The statute is most appropriately applied to instances where a taxpayer claims for an asset a value that the Commissioner determines is unduly high. The paradigmatic case is the inflated value claimed for a work of art in order to obtain a large deduction for a charitable donation." Id
 
 
 [7]
 According to section 6621(c)(1), the rate of interest in cases of underpayment due to tax motivated transactions "shall be 120 percent of the underpayment rate...." (Emphasis added)